**5-4103**
## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ABEL LUCIO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-4103-SLD |
| | ) | |
| JEFFERY OELBERG, et al., | ) | |
| | ) | |
| Defendants. | ) | |

### SUMMARY JUDGMENT ORDER

Plaintiff, Abel Lucio, proceeding pro se, filed suit under 42 U.S.C. § 1983, alleging that

various prison officials and other entities violated his constitutional rights while he was

incarcerated at Hill Correctional Center ("Hill"). Plaintiff has since been released from Hill and

deported to Mexico. In his complaint [1], Plaintiff alleged that the mattress he was provided at

Hill had blood and other bodily fluids on it and that broken, sharp bed springs were piercing

through his mattress, creating a hazardous condition. Plaintiff alleged that he complained to

prison officials about his mattress and bed springs, but they either failed to respond or ignored

him or told him no new mattresses were available. Plaintiff further alleged that on October 30,

2014, he cut his leg on the sharp bed springs and that on November 30, 2014, he cut his face on

the bed springs. Plaintiff requests compensatory damages for his injuries, as well as punitive

damages for bodily harm, emotional trauma, pain and suffering, and loss of enjoyment of life.

On November 30, 2015, the Court entered a merit review order [11], finding that Plaintiff

stated an Eighth Amendment claim against Defendants Sergeant Jeffery Oelberg and Lieutenant

Brian Batton for allegedly ignoring his complaints about the problems with his mattress, which

led to his injuries. The Court dismissed all other prison officials and entities named in the

complaint. On May 2, 2016, Plaintiff filed a motion for leave to amend his complaint [30], seeking to add Correctional Supply Supervisor Trevor Freiden[1] as a defendant; and on July 18, 2016, Plaintiff filed another motion for leave to amend his complaint [42], seeking to add Correctional Supply Supervisor Stephen Albert as a defendant. The Court granted both motions.

Now before the Court for consideration is Defendants' motion for summary judgment [72], to which Plaintiff has responded [77]. Defendants have filed a reply [78]. Based on the parties' pleadings, depositions, affidavits, and other supporting documents filed with the Court, Defendants' motion for summary judgment is GRANTED in part and DENIED in part.

## I.     MATERIAL FACTS

The following facts are recounted in the light most favorable to Plaintiff. *See Davis v. Carter*, 452 F.3d 686, 688 (7th Cir. 2006). Plaintiff was incarcerated at Hill Correctional Center from sometime in the beginning of 2013 to August 2016. (Pl.'s Dep. 11:19–12:8, ECF No. 73-1.) For approximately the first two years at Hill, Plaintiff was housed in cell 2-C-72. (*Id.* at 13:16–21.) During this time period, the cell had a bunk bed, and Plaintiff slept on the bottom bunk. (*Id.* at 24:23–25.) The bed was made of a metal frame with metal springs that supported two mattresses. (*Id.* at 25:1–9.) On the end of each spring was a hook, which allowed the springs to attach to the bed through holes in the frame. (*Id.* at 29:9–30:15.) Three of the hooks on the bottom bunk had become loose, causing them to "stick up . . . [more] than three centimeters." (*Id.*) These hooks "were very sharp," and they poked holes in his mattress. (*Id.*) Two of the hooks were approximately two or three centimeters apart and located "a little higher than the center" of the bed. (*Id.* at 35:15–18.) The other hook was located at the corner of one end of the bed. (*Id.* at 45:13–17.) Most of the time, Plaintiff would lay his head on this end of the bed to

---

[1] Plaintiff originally identified this defendant as "Frieden," but he signs his name "Freiden," so the Court will adopt that spelling and have the Clerk of the Court correct his name on the docket.

sleep, although he would sometimes lay his head on the other end of the bed when he was watching television. (*Id.* at 36:9–12.)

Plaintiff could not remove the loose springs from his bed without a tool, and even if he could, he would not have done so "because if you do something like that, they will think immediately that you are trying to create a knife from that." (*Id.* at 32:25–33:6.) Plaintiff tried to bend the hooks so they were not sticking straight up, "but [even] with the weight of the body, they [sprang] right back pointing up. You need something like a strong, like pliers to bend them down." (*Id.* at 33:13–19.)

When Plaintiff was first assigned to his cell, he was given a mattress that had dirt, urine, and blood on it. (*Id.* at 22:1–4, 23:18–25.) It was filled with pieces of canvas and other material as padding, and it was approximately ten centimeters thick. (*Id.* at 24:12–14, 25:24–26:7.) In either August or September of 2013, members of the tactical team commonly known as "Orange Crush" searched the inmates' cells. (*Id.* at 21:3–7, 23:6–10.) If Orange Crush team members "see a tiny hole [in a mattress] they think that [the inmate has] something hidden in there." (*Id.* at 20:22–23.) When the Orange Crush team members entered Plaintiff's cell and saw his mattress, they "tore it up in pieces" and removed a lot of the padding, leaving the mattress about as thick as a blanket. (*Id.* at 20:19–25, 24:12–16.) Plaintiff was not given a new mattress until approximately two years later, at which time another inmate described the mattress as follows: "The mattress had no cotton or foam-cushion in it at all. The mattress was literally just an outter [*sic*] cloth covering of what once was an actual bed mattress." (Moore Aff. ¶ 5, Pl.'s Resp., Ex. G, ECF No. 77-1.)

As a result of the mattress being so thin, the three metal hooks that were loose would pierce through the mattress. (Pl.'s Dep. 26:8–11.) Plaintiff tried to fall asleep in a certain position

to avoid the hooks, but during the night, he would "move from side to side . . . [and the] hooks would damage [his] back." (*Id.* at 29:15–19.) Plaintiff could have placed the mattress on the floor to sleep, but if he had done so, the officers would have written him a ticket or told him to put it back on his bed. (*Id.* at 27:24–29:1.) Since Plaintiff did not want to receive a ticket, he did not attempt to sleep on the floor with the mattress. (*Id.*) Plaintiff could fold the mattress to make it thick enough to cover the hooks, and he did so during the day to sit and watch television, but he could not do so at night or else he would have been sleeping on the bare springs that the folded mattress did not cover. (*Id.* at 38:12–39:16.) Plaintiff, however, did cover the hooks with articles of clothing "several times," but the hooks "kept ripping through" the clothing and "destroying" them. (*Id.* at 34:16–19.)

Plaintiff wanted a new mattress that was sanitary and that had padding, which would have been thick enough to cover the metal hooks. (*Id.* at 31:4–9.) To get a new mattress, Plaintiff's understanding of Hill's policy was that he had to submit a request slip. (*Id.* at 66:8–11.) Hill had "little piece[s] of paper" on which inmates could write down their request or complaint. (*Id.* at 60:16–24.) Inmates would then "place it in the box in the mail" to be answered. (*Id.*) Every day, an officer would empty the box and distribute the request slips to the appropriate personnel. (*Id.* at 62:3–4, 64:5–9.)

During the relevant time period, Defendant Freiden supervised the warehouse, commissary, and clothing room at Hill. (Freiden Interrog. ¶ 2, ECF No. 73-8.) Freiden states that if an inmate needed a new mattress, the inmate "would submit a written request to the warehouse for a mattress." (*Id.* ¶ 5.) "The inmate's name would then be recorded in an unofficial mattress request logbook. Mattresses would be replaced as they became available in the warehouse." (*Id.*) "[A]nyone who worked in the warehouse [including Freiden] . . . could issue a mattress or

replacement mattress . . . ." (*Id.* ¶¶ 4, 12.) Regarding broken bed springs, however, "individuals assigned to the Maintenance Department would be responsible for repairing or replacing" them. (*Id.* ¶¶ 4, 5, 9, 11.)

From approximately May 2013 to October 2014, Plaintiff sent three request slips to Defendant Freiden asking for a new mattress. (Pl.'s Dep. 58:23–59:9, 62:5–63:1.) In his request slips to Freiden, Plaintiff explained that his mattress was unsanitary and that the bed springs were piercing through the mattress. (Pl.'s Resp., Ex. D, ECF No. 77-0.) Plaintiff, however, did not receive a response from Freiden on any of his requests. (Pl.'s Dep. 59:1–5.)

On October 2, 2013, Plaintiff filed a grievance, stating that his mattress was unsanitary and requesting a new mattress. (Pl.'s Resp., Ex. A1.) The laundry supervisor responded, "Laundry does not issue mattresses." (*Id.*) In May and August of 2014, Plaintiff sent two affidavits to the warden, stating that some of the springs on his bed were broken, which caused dangerous, sharp hooks to be exposed. (Pl.'s Resp., Exs. B & B1.)[2]

During the relevant time period, Defendant Albert worked in the clothing room at Hill, first as a correctional officer and then as a correctional supply supervisor. (Albert Interrog. ¶¶ 1–2, ECF No. 73-7.) Plaintiff states that Albert did not work on the gallery where Plaintiff was housed. (Pl.'s Dep. 57:16–18.) On October 9, 2014, Plaintiff told Defendant Albert that he needed a new mattress because the bed springs were "killing" him, but Albert only laughed at him. (*Id.* at 57:3–10; Pl.'s Resp., Ex. C.) Albert states that he "does not recall receiving any specific complaint from Plaintiff" about his mattress. (Albert Interrog. ¶ 10.)

Defendant Albert "did not determine whether individuals received or did not receive mattresses at Hill . . . ." (*Id.* ¶ 5.) His "job duties did not require him to respond to inmate grievances . . . [and] did not entail repairing or replacing inmate mattresses." (*Id.* ¶ 11.)

---

[2] A legible copy of Exhibit B can be found in Plaintiff's original complaint. (Compl., ECF No. 1.)

During the relevant time period, Defendant Batton was employed as a lieutenant at Hill. (Batton Interrog. ¶ 1, ECF No. 73-5.) Plaintiff states that Batton worked on the gallery where he was housed. (Pl.'s Dep. 57:22–25.) On October 9, 2014, Plaintiff told Batton that he "needed a new mattress because the springs were sticking out of the mattress," and he asked Batton to check his back (presumably, the hooks were leaving marks on his back). (*Id.* at 50:7–51:5.) Batton told Plaintiff he had to write to the warehouse for a new mattress. (*Id.* at 51:11–21, 63:6–11.) Plaintiff tried to explain to Batton that he had already done so, but Batton ignored him and walked away without looking at the mattress. (*Id.*; Am. Compl. 4, ECF No. 12.) Batton states that he "does not recall having a conversation with Plaintiff on October 9, 2014," about his mattress. (Batton Interrog. ¶ 11.)

Defendant Batton states that "Freiden, who supervised the warehouse, would have been responsible for issuing mattresses." (*Id.* ¶ 4.) To receive a new mattress, "inmates would submit request slips to the warehouse and their names would then be placed on a list for replacement mattresses." (*Id.* ¶ 5.) "[I]nmates could either turn requests into a mailbox or have the requests hand-delivered to him, and he would then take the requests to the relevant departments." (*Id.* ¶ 7.) Nonetheless, "if he was made aware of a mattress that was in disrepair, he would have done what he could to get the inmate another mattress—by exchanging it with a mattress from an unoccupied bed and/or by forwarding an inmate request to the warehouse." (*Id.* ¶ 16.) Regarding the procedures at Hill for reporting broken bed springs, Batton states that "inmates can inform correctional staff of any maintenance issues they experience with the facilities or utilities in their cells." (*Id.* ¶ 9.) The staff would then "submit a work order to maintenance for any mattresses that had defective bed springs." (*Id.* ¶ 10.)

On October 15, 2014, Plaintiff sent an affidavit to Defendant Freiden and the maintenance office asking for a new mattress because his "old mattress [did] not protect[] [him] from the springs during the night." (Pl.'s Resp., Ex. D.) He requested a new mattress and for someone to come and fix the bed springs. (*Id.*) On October 24, 2014, Plaintiff filed a grievance, complaining about his mattress and stating that he sent four requests to the warehouse, which were all ignored. (Pl.'s Resp., Ex. D1.) The grievance counselor responded in writing, "Mattresses are to be shown to a security staff who will determine if it needs to be replaced." (*Id.*)

During the relevant time period, Defendant Oelberg was employed as a correctional sergeant at Hill. (Oelberg Interrog. ¶ 1, ECF No. 73-6.) Plaintiff states that Oelberg worked on the gallery where he was housed. (Pl.'s Dep. 58:1–8.) On October 27, 2014, Plaintiff "begged" Oelberg for a new mattress, but Oelberg ignored him. (*Id.* at 54:4–12.) Plaintiff submits an affidavit from another inmate who translated for Plaintiff when he spoke to Oelberg. (Aguirre Aff., Pl.'s Resp., Ex. G.) The inmate testified he told Oelberg that Plaintiff needed a new mattress because Plaintiff's mattress was old and the bed springs were making holes in the mattress. (*Id.*) Oelberg told Plaintiff that he could not get a new mattress because there were no new mattresses at Hill. (*Id.*) Oelberg states that he "does not recall having a conversation with Plaintiff on October 27, 2014," about his mattress. (Oelberg Interrog. ¶ 11.)

Regarding the procedures for an inmate to receive a new mattress or have bed springs repaired, Defendant Oelberg's testimony essentially mirrors Defendant Batton's testimony. (*Id.* ¶¶ 4–10, 12, 16.) This includes Oelberg stating that "if he was made aware of a mattress that was in disrepair, he would have done what he could to get the inmate another mattress—by

exchanging it with a mattress from an unoccupied bed and/or by forwarding an inmate request to the warehouse." (*Id.* ¶ 16.)

On the night of October 31, 2014,[3] Plaintiff was sleeping on the bottom bunk of the bed. (Pl.'s Dep. 39:17–24.) At approximately 9:30 p.m., Plaintiff got up and used the bathroom. (*Id.*) When he returned, he climbed back into bed but forgot about the three-centimeter, sharp bed spring hook, and the "hook hooked onto" his right leg below the knee and "pulled [his] entire flesh." (*Id.* at 39:24–41:1.) To provide clarity to this phrase, the Court notes that in his complaint, Plaintiff alleged that "one of the springs from the bed was poking out of the mattress with pieces of [his] flesh attached to it." (Compl. 5.) Plaintiff states that the wound was approximately "three to five centimeters" and caused him to bleed "a lot." (Pl.'s Dep. 41:17–20, 48:10–14.)

Right after sunrise, Plaintiff notified two officers, and they cleaned his wound and took him to the health care unit. (*Id.* at 40:14–41:16.) A nurse examined Plaintiff and noted a one centimeter by one-half centimeter injury that was less than one-quarter centimeter deep. (Offender Outpatient Progress Notes, ECF No. 73-4.) The nurse also noted that Plaintiff described his pain as a five on a ten-point scale. (*Id.*) At one point during his deposition, Plaintiff was asked, generally, whether he had any reason to dispute any of the medical records, and he answered, "No." (Pl.'s Dep. 44:7–10.) The discrepancy in the medical records regarding the size of Plaintiff's injury, however, was never specifically discussed during his deposition. (*Id.*)

After examining Plaintiff, the nurse gave him a tetanus shot and cleaned and applied dressing to the wound. (*Id.* at 41:12–16.) Approximately one week later, Plaintiff saw a nurse,

---

[3] In his complaint and deposition, Plaintiff states that his first injury occurred on October 30, 2014. However, both he and the medical records confirm that Plaintiff sought medical attention the day after the injury, and the medical records indicate that he received medical attention on November 1, 2014. Thus, in the interest of convenience, the Court will use October 31, 2014, as the date of Plaintiff's injury, as indicated in the medical records.

who then "sent [him] to the doctor because the pain was very intense." (*Id.* at 43:15–22.) Over the next four months, Plaintiff went to the health care unit on several occasions with complaints of leg pain. (Pl.'s Resp., Ex. G1.)

Also on November 1, 2014, Plaintiff filed a grievance.[4] (Pl.'s Resp., Ex. E1.) Plaintiff explained in the grievance that on multiple occasions he complained to Defendants about his mattress and bed springs and asked for a new mattress but everyone ignored his requests. (*Id.*) He explained that he had just suffered a leg injury because the bed springs had pierced his mattress and stabbed his leg. (*Id.*) He directed his complaint to Defendant Freiden, stating that he saw Freiden give new mattresses to other inmates but not him and asking why Freiden had not taken care of his request. (*Id.*) On November 10, 2014, the grievance counselor responded with a quotation from Freiden: "I checked my mattress request log book and I have not received a request from the above inmate." (*Id.*)

Plaintiff appealed the counselor's response to the grievance officer. (*Id.*) The grievance officer first noted that Defendant Freiden had no record of Plaintiff's request. (*Id.*) The grievance officer then responded, "[Plaintiff] does not state whether or not he has submitted a request to . . . Freiden since receiving [the counselor's] response." (*Id.*) The grievance officer also noted that Plaintiff wrote to the maintenance department requesting that someone repair his bed springs. (*Id.*) The grievance officer then responded, "[Plaintiff] does not state that he ever reported the problem to his wing officer, so that a work order could be completed and submitted to Maintenance for processing. That is the correct procedure. Repairs and services are not

---

[4] Plaintiff's grievance is dated October 31, 2014. In the grievance, he indicates that he was injured the day before, which is consistent with his belief that his injury occurred on October 30, 2014. However, for convenience, assuming that Plaintiff was injured on October 31, 2014, as indicated in the medical records, his grievance would have been filed on November 1, 2014.

scheduled by offenders sending request slips to the Maintenance Department." (*Id.*) The grievance officer then denied Plaintiff's grievance. (*Id.*)

On November 30, 2014, Plaintiff suffered another injury when one of the hooks "hooked on [his] face," causing him to bleed "maybe two, three drops." (Pl.'s Dep. 44:15–21, 48:6–9.) Plaintiff reported the injury to an officer, but because it was not an emergency, seven days passed before a nurse saw him. (*Id.* at 47:20–48:5.) After the nurse examined him, she cleaned the wound and told Plaintiff not to scratch his face. (*Id.*)

On December 1, 2014, Plaintiff sent an affidavit to the new warden, explaining the situation with his mattress and informing her about his two injuries. (Pl.'s Resp., Ex. F1.) The next day, maintenance personnel came to Plaintiff's cell and fixed the broken bed springs. (*Id.*) On August 3, 2015, Plaintiff filed the instant law suit. (Compl. 1) On August 18, 2015, an unidentified officer replaced Plaintiff's mattress with an extra mattress from another cell. (Pl.'s Dep. 20:6–13; Moore Aff. ¶¶ 2–4.)

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A movant may demonstrate the absence of a material dispute through specific cites to admissible evidence, or by showing that the nonmovant "cannot produce admissible evidence to support the [material] fact." Fed. R. Civ. P. 56(c)(B). If the movant clears this hurdle, the nonmovant may not simply rest on his or her allegations in the complaint, but instead must point to admissible evidence in the record to show that a genuine dispute exists. *Id.*; *Harvey v. Town of Merrillville*, 649 F.3d 526, 529 (7th Cir. 2011). "In a § 1983 case, the plaintiff bears the burden of proof on the constitutional deprivation that underlies the claim, and thus must come forward

with sufficient evidence to create genuine issues of material fact to avoid summary judgment."

*McAllister v. Price*, 615 F.3d 877, 881 (7th Cir. 2010).

At the summary judgment stage, evidence is viewed in the light most favorable to the nonmovant, with material factual disputes resolved in the nonmovant's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute of material fact exists when a reasonable juror could find for the nonmovant. *Id.*

## III. ANALYSIS

In its prohibition of "cruel and unusual punishments," the Eighth Amendment, applicable to the states through the Due Process Clause of the Fourteenth Amendment, imposes upon prison officials the duty to provide humane conditions of confinement. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). To succeed on a claim of hazardous conditions of confinement, a plaintiff must satisfy a test that contains both an objective and subjective component. *Lunsford v. Bennett*, 17 F.3d 1574, 1579 (7th Cir. 1994). The objective component focuses on whether a plaintiff was forced to endure conditions that "exceeded contemporary bounds of decency of a mature, civilized society." *Id.* The subjective component focuses on whether the prison officials acted with a "sufficiently culpable state of mind." *Id.* For cases involving hazardous conditions of confinement, a "deliberate indifference" standard is used. *Id.* To be held liable, a prison official must know of and disregard an excessive risk to inmate health or safety. *Farmer*, 511 U.S. at 837.

### A. Objective Component

Defendants argue they are entitled to summary judgment because (1) the bed springs piercing through Plaintiff's mattress did not present a sufficiently serious risk of harm, (2) Plaintiff could have mitigated any risk of harm by manipulating his mattress or placing it on the

floor, and (3) Plaintiff did not suffer a serious injury. Plaintiff argues that the evidence he has

presented shows that the hazardous condition created by the broken bed springs and thin mattress

was cruel and unusual punishment because it persisted for more than two years and caused two

injuries.

Under the Eighth Amendment, "jails must meet minimal standards of habitability," which

"includes adequate bedding." *Budd v. Motley*, 711 F.3d 840, 843 (7th Cir. 2013); *see also*

*Townsend v. Fuchs*, 522 F.3d 765, 773 (7th Cir. 2008) (stating that inadequate bedding may

support an Eighth Amendment claim). Moreover, prisons "must address easily preventable,

observed hazards that pose a significant risk of severe harm to inmates." *Anderson v. Morrison*,

835 F.3d 681, 683 (7th Cir. 2016). The Eighth Amendment protects prisoners from the

unnecessary infliction of pain caused by hazardous prison conditions. *Pyles v. Fahim*, 771 F.3d

403, 408 (7th Cir. 2014). A prison condition is hazardous when it "poses an unreasonable peril."

*Anderson*, 835 F.3d at 683. When risk of injury is small and the prison condition is necessarily

unavoidable, such as a wet shower floor, the Seventh Circuit has held that the condition does not

pose a sufficient risk of harm. *See Pyles*, 771 F.3d at 410. However, when risk of injury is great

and the prison condition is avoidable, such as stairs slicked with milk and cluttered with garbage,

the Seventh Circuit has held that the condition poses a sufficient risk of harm. *Anderson*, 835

F.3d at 683.

Here, Plaintiff presents evidence that three of his bed springs were broken, causing the

hooks on the end of the springs to stick up approximately three centimeters. These hooks were

sharp and pierced through Plaintiff's mattress, which had no padding and was as thin as a

blanket. Each night for two years, Plaintiff slept on the bed in this condition and, had he shifted

his body differently, his injuries could have been much worse. The condition of Plaintiff's bed

and mattress was also not something that was unavoidably necessary, such as a wet shower floor.

Therefore, the Court finds that Plaintiff presents sufficient evidence that the bed spring hooks

posed an unreasonable risk of significant harm and were an objectively serious hazard.

In addition to presenting evidence of an objectively serious hazard, however, a plaintiff

must present evidence that he suffered a cognizable harm. *Gray v. Hardy*, 826 F.3d 1000, 1006

(7th Cir. 2016). A plaintiff may meet this burden by presenting evidence of physical injury "that

a reasonable doctor or patient would find important and worthy of comment or treatment; the

presence of a medical condition that significantly affects an individual's daily activities; or the

existence of chronic and substantial pain." *Id.* (quoting *Hayes v. Snyder*, 546 F.3d 516, 523 (7th

Cir. 2008)).

In *Gray*, the Seventh Circuit held that the plaintiff presented sufficient evidence of a

physical injury by stating that his asthma became worse as a result of unsanitary conditions, as

well as that he suffered from skin breakouts. *Id.* The Seventh Circuit pointed out that this was

"enough to show some physical injury," given that it was a "prison-conditions case [and] not a

case about inadequate medical treatment." *Id.* "Excessive cold, for example, can also amount to

an Eighth Amendment violation, even if the prisoner has not yet come down with the flu." *Id.* In

contrast, the Seventh Circuit has held that "breathing problems, chest pains, dizziness, sinus

problems, headaches and a loss of energy" caused by exposure to second-hand smoke "are,

objectively speaking, relatively minor." *Henderson v. Sheahan*, 196 F.3d 839, 846 (7th Cir.

1999).

Here, Plaintiff presents evidence that one of the bed spring hooks injured him by ripping

a piece of flesh off of his right leg below the knee. The medical records indicate that the size of

the wound was one centimeter long by one-half centimeter wide and less than one-quarter

centimeter deep. A piece of flesh being ripped out of someone's leg, even one this small, can cause significant pain. Plaintiff, however, states that the wound was even larger—approximately three to five centimeters. Although Plaintiff, generally, does not dispute the medical records, he was not asked specifically whether he disputed the reported size of his injury. The medical records also indicate that Plaintiff's pain level was a five on a ten-point scale. Plaintiff states that he was seen by a doctor one week later because he suffered from intense pain in his leg. In sum, the injury Plaintiff sustained is one that a "reasonable doctor or patient would find important and worthy of comment or treatment." *Gray*, 826 F.3d at 1006. Therefore, the Court finds that Plaintiff has presented sufficient evidence that he suffered a serious physical injury.

The Court finds unpersuasive Defendants' argument that Plaintiff could have mitigated any risk of harm by manipulating his mattress or placing it on the floor. First, if Plaintiff had folded his mattress to make it thick enough to cover the hooks, then he would have had to sleep on bare springs, which would be unacceptable as a condition falling below the "minimal civilized measure of life's necessities." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Second, according to Plaintiff, correctional officers would not have allowed Plaintiff to sleep on his mattress on the floor. Therefore, the Court finds Plaintiff has presented sufficient evidence that he was unable to mitigate the risk of harm from the bed spring hooks.

### B. Subjective Component

Defendants Batton, Oelberg, and Albert argue they are entitled to summary judgment because they did not decide whether or not inmates received new mattresses. Defendant Freiden concedes that he had the power to provide Plaintiff a new mattress, but he argues that he never received a request slip from Plaintiff and that Plaintiff has not presented any evidence that he did receive one.

A prison official acts with deliberate indifference when he knows "that a substantial risk of serious harm to a prisoner exists, but disregards it." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015). "An inmate's correspondence to a prison administrator may . . . establish a basis for personal liability under § 1983 where that correspondence provides sufficient knowledge of a constitutional deprivation." *Id.* at 781–82. A prison official who has sufficient knowledge of a hazardous condition must "exercise his or her authority and . . . take the needed action to investigate and, if necessary, to rectify the offending condition." *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996). However, liability does not extend to "everyone who knows about a prisoner's problems." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). "The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under §1983 for not being ombudsmen." *Id.* Moreover, officials do not act with deliberate indifference "if they are helpless to correct the protested conditions." *Dixon v. Godinez*, 114 F.3d 640, 645 (7th Cir. 1997).

1.      **Defendants Batton and Oelberg**

Plaintiff presents evidence that Defendant Batton, a lieutenant, and Defendant Oelberg, a sergeant, worked on the gallery where he was housed. He also presents evidence that he told them about the hazardous condition of his bed springs and mattress but that they did not investigate or rectify the situation. Batton and Oelberg argue they cannot be held liable for deliberate indifference because they were powerless to provide Plaintiff a new mattress. Batton and Oelberg, however, acknowledged in their interrogatories that they could have submitted a work order to the maintenance department to fix the springs or done something to get Plaintiff another mattress, had they known about Plaintiff's complaints. Batton and Oelberg, though,

dispute that Plaintiff told them about the hazardous condition, but this is a dispute that cannot be resolved on summary judgment. If a jury finds that Plaintiff made them aware of the sharp bed spring hooks and thin mattress, then the jury could conclude that Batton and Oelberg acted with deliberate indifference by failing to do anything about it. Therefore, the Court finds that Plaintiff has presented sufficient evidence that Batton and Oelberg acted with deliberate indifference.

### 2. Defendant Albert

Plaintiff states that Defendant Albert did not work on the gallery where he was housed. Instead, Albert worked in the clothing room at Hill. He was not a sergeant, lieutenant, or grievance officer. Albert states that his job duties did not require him to respond to inmate grievances or to determine whether inmates needed a new mattress. Even in a light most favorable to Plaintiff, this evidence shows that Albert is too far removed from the situation to be held liable. Liability does not extend to everyone who knows about an inmate's conditions, and at some point, correctional officers must be permitted to rely on the division of labor within the prison. *See Burks*, 555 F.3d at 595. Therefore, the Court finds that Albert did not have a duty to investigate or rectify the hazardous condition of Plaintiff's bed springs and mattress, and as such, he cannot be held liable for deliberate indifference.

### 3. Defendant Freiden

All of the parties agree that one of the ways an inmate may request a new mattress is by sending a request slip to Defendant Freiden. Plaintiff states that inmates placed request slips in a box, and an officer would come by every day and empty the box. Plaintiff states that he placed in the box three or four request slips addressed to Freiden, explaining the hazardous condition and requesting a new mattress. Plaintiff, however, acknowledges that he does not have any evidence that Freiden received the request slips, and Freiden states that he never received them.

Nonetheless, the Court finds that Plaintiff presents sufficient evidence for a jury to find

that Freiden's testimony is not credible and that Freiden received the request slips and had actual

knowledge of the hazardous condition of Plaintiff's bed springs and mattress. *See Gentry v.*

*Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995) (reversing grant of summary judgment to

superintendent after concluding it was reasonable that superintendent "knew of the

[constitutional violation], even if only by the many letters [the prisoner] sent him"); *see also*

*Perez*, 792 F.3d at 781 (discussing *Gentry*).

### C.     Qualified Immunity

Defendants argue, alternatively, that they are entitled to qualified immunity because it

was not clearly established at the time either that the conditions of Plaintiff's confinement were

so severe to constitute cruel and unusual punishment or that Plaintiff suffered harm beyond mere

discomfort. Prison officials "are entitled to qualified immunity from liability arising out of

conduct that 'does not violate clearly established statutory or constitutional rights of which a

reasonable person would have known.'" *Babcock v. White*, 102 F.3d 267, 276 (7th Cir. 1996)

(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "While the right must be defined at

the appropriate level of specificity, it is not to say 'that an official action is protected by qualified

immunity unless the very action in question has previously been held unlawful . . . .'" *Delaney v.*

*DeTella*, 256 F.3d 679, 686 (7th Cir. 2001) (quoting *Wilson v. Layne*, 526 U.S. 603, 615 (1999)).

"Rather, it is enough if, based on the pre-existing law, the unlawfulness of the conduct is

apparent." *Id.*

It is clearly established that "[p]rison officials who recklessly expose a prisoner to a

substantial risk of a serious physical injury violate his Eighth Amendment rights . . . ." *Smith v.*

*Peters*, 631 F.3d 418, 421 (7th Cir. 2011). It is also clearly established that prison officials must

provide inmates adequate bedding. *See Budd*, 711 F.3d at 843; *Townsend*, 522 F.3d at 773.

Although there appears to be no case law holding that sharp bed spring hooks piercing through a

thin mattress constitutes an objectively serious condition, this level of specificity is not required

to hold Defendants liable. If the condition of Plaintiff's bed and mattress was as he testifies, then

the unlawfulness of not fixing the bed springs or not providing him another mattress is apparent.

It is also apparent that a hook ripping a piece of flesh from someone's leg is "worthy of comment

or treatment," *Gray*, 826 F.3d at 1006, and as such, it is a cognizable harm. Therefore,

Defendants Batton, Oelberg, and Freiden are not entitled to qualified immunity.

**IT IS THEREFORE ORDERED:**

1) **Defendants' motion for summary judgment [72] is GRANTED in part and DENIED in part. Summary judgment is granted to Defendant Albert. Summary judgment is denied to Defendants Batton, Oelberg, and Freiden.**
2) **The Clerk of the Court is directed to terminate Defendant Albert as a party to this case.**
3) **The Clerk of the Court is also directed to change the name of Defendant "Frieden" on the docket to Defendant "Trevor Freiden."**
4) **This case is referred to Magistrate Judge Hawley for a settlement conference. A final pretrial and jury trial will be scheduled if no settlement is reached.**

Entered this 8th day of February 2018.

        /s Sara Darrow
        SARA DARROW
UNITED STATES DISTRICT JUDGE